OPINION *Page 2 
{¶ 1} Defendant-appellant Marjorie Gibson appeals from the January 12, 2006 Judgment Entry of the Tuscarawas County Court of Common Pleas.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Appellant Marjorie Gibson and appellee John Gibson, Sr. were married in June of 1992. No children were born as issue of such marriage. Appellee had been married once and widowed before the parties' marriage. Appellant had been married two other times, both marriages ending in divorce.
 {¶ 3} On November 13, 2003, appellee filed a complaint for divorce against appellant in the Tuscarawas County Court of Common Pleas. In response, appellant, on November 26, 2003, filed an answer and counterclaim. On the same date, appellant filed a motion seeking temporary spousal support.
 {¶ 4} Pursuant to a Magistrate's Order filed on March 17, 2004, appellee was ordered to pay temporary spousal support to appellant in the amount of $700.00 per month, effective December 1, 2003.
 {¶ 5} Subsequently, a trial before a Magistrate commenced on October 26, 2004. The following testimony was adduced at the trial.
 {¶ 6} At the trial, appellee, who was 71 years old at the time, testified that he had lived at the residence located at 924 Kelly Street Northwest in New Philadelphia since he purchased the same in 1961 with his first wife. During their marriage, appellant and appellee lived in the house, which had been paid for since February of 1969, together. Appellee testified that in October of 1994, appellant's name was put on a joint and survivorship deed to the house so that, if he passed away, the house would go *Page 3 
directly to appellant. When asked, appellee testified that, by putting appellant's name on the deed, he did not intend for the house to go to appellant if the two got divorced. Appellee further testified that appellant never contributed anything toward the house from her earnings or her premarital monies.
 {¶ 7} With respect to the house on Kelly Street, appellee testified that the parties remodeled the same. Appellee specifically testified that they remodeled the bathroom and that the remodeling was done two months before appellee left. He further testified that he paid a total of approximately $6,465.00 for the bathroom remodeling. Appellee also testified that he paid for new shingles to be put on the roof and for a new front porch. Appellee testified that the cost for the same was between $7,000.00 and $8,000.00, although he did not produce any cancelled checks.
 {¶ 8} When asked how he became separated from his wife, appellee testified that, in November of 2003, appellant along with her mother, who had lived with the parties for three years without paying rent, moved out of the Kelly Street house. Appellee testified that appellant then moved into a house located on Parrish Street in Uhrichsville that was owned by appellant before the parties' marriage and that appellant had sold to her daughter and son-in-law in November of 1999. Appellee testified that he previously had loaned appellant $10,000.00 to pay off the house on Parrish Street and that appellant paid him back such amount. According to appellee, appellant gave the remaining proceeds from the sale of the Parrish Street house to her church. Appellee also testified that, from 1992 to 1999, appellant rented the Parrish Street house to her daughter and that he did not receive any of the rental income since it was appellant's money. *Page 4 
 {¶ 9} Testimony was adduced at trial that the parties' joint adjusted gross income for 2001 was $9,573.00, for 2002 was $8,625.00 and, for 2003, was $8,289.00.
 {¶ 10} At trial, appellee further testified that he retired on or about February 26, 1993 after working 38 years at a boring mill owned by the Gradall Company. Thus appellee retired approximately 8 months after the parties' marriage. Appellee also testified that he had been diagnosed with leukemia, has a hole in his eardrum, has sugar diabetes and has abdominal problems. Appellee takes medication for depression and spends $50.00 to $75.00 a month on prescription drugs. Appellee receives health insurance through his former employer.
 {¶ 11} During the trial in this matter, appellee was questioned about his retirement benefits. Appellee testified that he receives two checks a month from his former employer. While one check is in the amount of $326.39, the other is in the amount of $213.49. In addition, appellant receives a monthly social security check in the amount of $938.00 and a monthly check in the amount of $800.00 from a Pioneer Fund account. With respect to the latter, appellee testified that he established a Pioneer Fund savings account in approximately December of 1985 and opened a Pioneer Investments IRA in February of 1986 and that appellee never contributed any money to either. As of October of 2004, the Pioneer Fund balance was $78,789.67. The following is an excerpt from appellee's trial testimony:
 {¶ 12} "Q. Okay. So this fund in its entirety, both the savings and the IRA, was opened in `85 and `86, prior to your marriage?
 {¶ 13} "A. Yes.
 {¶ 14} "Q. What funds went into the IRA portion of your Pioneer Fund Account? *Page 5 
 {¶ 15} "A. Well, I put that in there from where I worked, my earnings.
 {¶ 16} "Q. Okay. Now Sir, as regards this Pioneer Investments Fund, I want you to look at the cover page of this exhibit and tell the Court what amount it shows there at the present time?
 {¶ 17} "A. That's not up to present time right now.
 {¶ 18} "Q. Okay, I'm sorry. As of December the 11th, 2003, that's what is on there and you're correct.
 {¶ 19} "A. It was ninety-three thousand seventeen dollars and seventy-four cents.
 {¶ 20} "Q. Ninety-three thousand seventeen dollars and seventy-four cents.
 {¶ 21} "A. Right.
 {¶ 22} "Q. — is that correct?
 {¶ 23} "A. Right.
 {¶ 24} "Q. Has anyone's monies other than your monies ever gone into the Pioneer Fund Investment Accounts?
 {¶ 25} "A. Not one penny.
 {¶ 26} "Q. Okay. And have they continued to grow since you started them in `85 and `86?
 {¶ 27} "A. Yes.
 {¶ 28} "Q. Okay. Now, I want to look at this statement again. It does show as of now, it shows Marjorie Gibson's name on that account also; is that correct?
 {¶ 29} "A. Yeah, that's right.
 {¶ 30} "Q. At some point in time after your marriage, did you put her name on that account, Sir? *Page 6 
 {¶ 31} "A. Yes.
 {¶ 32} "Q. Has she ever contributed any monies to that account, Sir, ever?
 {¶ 33} "A. No, sir, not one penny." Transcript at 72-73.[1]
 {¶ 34} In 1994, appellee added appellant's name to the Pioneer Fund account so that if he died, appellant would be taken care of. Appellee testified that he was willing to continue with the marriage at the time appellee walked out in November of 2003.
 {¶ 35} At trial, appellee also testified that his average monthly expenses are $1,400.89 and that he had paid spousal support in the amount of $700.00 a month from December 1, 2003, through October of 2004. Appellee further testified that he had an account at the Dover-Phila Credit Union that, as of October 31, 2004, had a balance of $3,049.57. The account was opened prior to his marriage to appellant. Appellee also has an account at Belmont National Bank that he opened prior to his marriage into which he deposits his $800.00 a month Pioneer Fund checks. Appellant's name was added to such account in 1994. In November of 2004, appellee withdrew $9,985.32 from his account at Belmont National Bank, which was a joint account, and put it into a separate account in his name only at such bank. As of November of 2004, the account had a balance of $7,597.44.
 {¶ 36} On cross-examination, appellee testified that he deposited his $800.00 a month check from Pioneer into his account at Belmont National Bank every month and that he withdrew money from the same to pay spousal support and to pay his attorney. Appellee specifically testified that he withdrew two checks, one in the amount of $4,600.00 and the other in the amount of $2,100.00, to pay spousal support. He further *Page 7 
testified that, in October of 1994, appellant executed a will leaving everything to appellant and that appellant executed a will leaving everything to him and that, on the same date, he transferred a half interest in his house to appellant and appellant transferred a half interest in her house on Parrish Street to him.
 {¶ 37} Appellee also testified on cross-examination that appellant's daughter made rental payments on the Parrish Street house to appellant and that he kept a record of the same. When asked, appellee testified that he did not know what appellant did with the rent money.
 {¶ 38} The following is an excerpt from appellee's testimony on cross-examination:
 {¶ 39} "Q. I see. Now, this — is there any questions that you closed out, after Marjorie left, all the joint accounts?
 {¶ 40} "A. There's no question.
 {¶ 41} "Q. You did that?
 {¶ 42} "A. I did that, yes.
 {¶ 43} "Q. You took her off the checking?
 {¶ 44} "A. Yes.
 {¶ 45} "Q. You took her off of the Belmont National Bank?
 {¶ 46} "A. Yes.
 {¶ 47} "Q. You took her off of the Pioneer fund?
 {¶ 48} "A. No.
 {¶ 49} "Q. You left her on the Pioneer fund?
 {¶ 50} "A. Couldn't take it off. *Page 8 
 {¶ 51} "Q. Couldn't take it off? Court order?
 {¶ 52} "A. No, they won't' let me do it without her signature.
 {¶ 53} "Q. I see. How about the money from Dover-Phila Credit Union you took her off there also?
 {¶ 54} "A. Yes." Transcript at 173.
 {¶ 55} On redirect, appellee testified that he put appellant's name on his house and his accounts for estate planning purposes.
 {¶ 56} Mary O'Hara, appellant's daughter, testified at the trial that her mother was living with her in an apartment above O'Hara's house. O'Hara testified that appellant paid for her own electric, phone, and cable and that while appellant was supposed to pay $350.00 a month in rent to O'Hara, she had been paying $250.00 since that was all she could afford. O'Hara also testified that she rented part of the Parrish Street house after the parties were married and that she paid rent to appellant.
 {¶ 57} At trial, appellant testified that the last year her mother lived with the parties, her mother paid rent of $300.00 a month that appellant put into a bedroom drawer. Appellant's mother also testified that she paid $300.00 a month in rent to appellant. Appellant also testified that, in October 1994, she added appellee's name to the deed for her house on Parrish Street via a survivorship deed since "what was his he gave to me and what was mine I gave to him." Transcript of November 30, 2004 at 11. Appellee testified that when she sold the house on Parrish Street to her daughter, the parties received a total of $18,623.26 and that, of such amount, she donated $10,000.00 to her church. According to appellant, appellee took the remainder of the money and hid it. *Page 9 
 {¶ 58} Appellant further testified that she did not close any accounts or transfer or take any funds from any accounts before leaving appellee. Appellant also testified that, during the period from 1992 through 1998, she received rental income from the Parrish Street property totaling $26,609.20. The mortgage payment on the same was $228.00 a month. Appellant testified that she did not keep any of the rent money for herself, but rather put it into a drawer.
 {¶ 59} At trial, appellant also testified that the parties, not only appellant, paid for the improvements, including the bathroom remodeling, made to the Kelly Street property. According to appellant, the parties had the Kelly Street home repainted, replaced spouting, roofing and carpeting. Appellant further testified that appellee closed the parties' joint account at Dover-Phila Credit Union and that she did not know what had happened to the funds in such account.
 {¶ 60} At trial, appellant, who was 66 years old, testified that she receives $421.00 a month in social security and that, other than spousal support, she did not have any other income. She further testified that she did not have any retirement benefits or pensions and that her social security checks were deposited into an account at the Dover-Phila Credit Union starting in June of 2002. Appellant also testified that she has high blood pressure.
 {¶ 61} When questioned about her current living situation, appellant testified that she pays her daughter $350.00 a month in rent and that her total monthly living expenses were $1,096.47.
 {¶ 62} On cross-examination, appellant testified that appellee opened the Pioneer Fund account prior to the parties' marriage and that she had never made a *Page 10 
deposit to or withdrawal from the same. She admitted that such account was appellee's premarital property. Appellant, when questioned about the Belmont National Bank account, testified that appellant had such account prior to their marriage. While she was unsure whether she had ever made a deposit into such account, appellant testified that she had never made any withdrawals.
 {¶ 63} Appellant also testified that, after the Parrish Street house was sold, she donated $10,000.00 of the $18,623.25 in proceeds to her church and that she repaid appellant, who had loaned her $10,000.00, the remainder ($8,623.26).
 {¶ 64} Subsequently, the Magistrate, pursuant to a decision filed on May 2, 2005, found that all of the funds in the Pioneer account and the house on Kelly Street were appellee's premarital property and recommended that the same be awarded to him. She further recommended as follows:
 {¶ 65} "Spousal support in the amount of Four Hundred Dollars ($400.00) per month is appropriate for a period of thirty-six (36) months, for a total of Fourteen Thousand Four Hundred Dollars ($14,400.00). Of that amount Eleven Thousand Two Hundred Dollars ($11,200.00) has already been paid as of 03/2005, leaving a balance of three Thousand Two Hundred Dollars ($3,200.00). John Gibson is entitled to One Thousand Three Hundred Seventy-Six Dollars and Seventy-Four Cents ($1,376.74), which he has not been reimbursed for the loan to pay off the Parrish Street home. Marjorie Gibson is entitled to Two Thousand Three Dollars and Thirteen Cents ($2,003.13) which is one-half of the Dover Phila. Account. Marjorie Gibson is entitled to Seven Thousand Dollars ($7,000.00) which is one-half the cost of improvements to John Gibson's home. John Gibson should pay Marjorie Gibson Seven Thousand Six *Page 11 
Hundred Twenty-Six Dollars and Thirty-Nine Cents ($7,626.39) as a property settlement within twelve (12) months of the date of this decision. John Gibson should pay Three Thousand Two Hundred Dollars ($3,200.00) in additional spousal support to Marjorie Gibson at the rate of Four Hundred Dollars ($400.00) a month. Should John Gibson choose to pay either the property settlement or the spousal support in a lump sum, he may do so."
 {¶ 66} Appellant then filed objections to the Magistrate's Decision. As memorialized in a Judgment Entry filed on January 12, 2006, the trial court overruled the objections and adopted the Magistrate's decision "without modification." The trial court awarded appellee the Kelly Street property and the proceeds in the Pioneer Fund, finding that the same were premarital property, and awarded each party their separate bank accounts. The trial court also awarded appellant spousal support in the amount of $400.00 a month for a period of 36 months, for a total of $14,400.00. Since appellee had already paid $17,500.00 in temporary spousal support, the trial court awarded appellee a credit of $3,100.00. The trial court, in its entry, further stated, in relevant part, as follows:
 {¶ 67} "ORDERED, ADJUDGED AND DECREED that John T. Gibson, Sr. is obligated to pay to Marjorie A. Gibson, as and for the total property settlement in this case, the sum of $5,623.26.
 {¶ 68} "ORDERED, ADJUDGED AND DECREED that in applying the $3,100.00 credit for overpaid monetary spousal support to Marjorie Gibson, the total property settlement amount owed by John T. Gibson, Sr. to Marjorie Gibson is $2,523.26 as of 1/11/06. Consequently, John T. Gibson, Sr. shall pay the sum of $2,523.26 less the *Page 12 
$100.00 owed by Marjorie Gibson to John T. Gibson, Sr. as a mediation sanction (see above) within thirty (30)[2] days of the journalization of this Judgment Entry."
 {¶ 69} Appellant now raises the following assignments of error on appeal:
 {¶ 70} "I. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FINDING THAT APPELLEE'S REAL PROPERTY WAS APPELLEE'S SEPARATE PROPERTY IN THAT SUCH FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 71} "II. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN REDUCING APPELLANT'S PROPERTY DIVISION AWARDS WITHOUT EXPLANATION AND ISSUED A CONFUSING JUDGMENT ENTRY PREJUDICIAL TO THIS APPELLANT.
 {¶ 72} "III. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN GRANTING APPELLEE A CREDIT ON SPOUSAL SUPPORT PAID BY HIM TO SUPPORT APPELLANT WHO WAS 66 YEARS OF AGE AND WHOSE INCOME ONLY CONSISTED OF SOCIAL SECURITY BENEFITS OF $421.00 PER MONTH. IT FURTHER ERRED IN FAILING TO ORDER CONTINUED SPOUSAL SUPPORT.
 {¶ 73} "IV. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN GRANTING TO APPELLEE ALL OF HIS PREMARITAL PROPERTY AND IN NOT GRANTING TO APPELLANT ALL OF HER PREMARITAL PROPERTY OR EQUIVALENT VALUE THEREOF.
 {¶ 74} "V. THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT FAILED TO FIND APPELLEE GUILTY OF FINANCIAL MISCONDUCT IN THE *Page 13 
INSTANT CAUSE AND IN FAILING TO AWARD THE APPELLANT A DISTRIBUTIVE AWARD."
 I {¶ 75} Appellant, in her first assignment of error, argues that the trial court erred in finding that the Kelly Street property was appellee's separate property. Appellant specifically contends that because appellant's name was added to the property in 1994 via a joint and survivorship deed, the property became marital property. We disagree.
 {¶ 76} A spouse can convert separate property into marital property by making an inter vivos gift to his or her spouse. Helton v. Helton
(1996), 114 Ohio App.3d 683, 685, 683 N.E.2d 1157, 1159. To prove that an inter vivos gift has been made, the following elements are required: "(1) an intention on the part of the donor [husband] to transfer the title and right of possession of the particular property to the donee [wife] then and there and (2), in pursuance of such intention, a delivery by the donor to the donee of the subject-matter of the gift to the extent practicable or possible, considering its nature, with relinquishment of ownership, dominion and control over it." Id. at 685-686.
 {¶ 77} "The donee has the burden of showing by clear and convincing evidence that the donor made an inter vivos gift." Id . at 686. Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford (1954), 161 Ohio St. 469,120 N.E.2d 118, paragraph three of the syllabus.
 {¶ 78} Thus, the issue becomes whether appellee had the requisite donative intent to transfer a possessory interest in the Kelly Street property to appellant when he *Page 14 
added her name to the property via a joint and survivorship deed. While both parties' names appear on the deed for such property, such fact is not determinative of whether the property is marital or separate property. See R.C. Section 3105.171(H) and McFarland v. McFarland (Sept. 19, 1994), Richland App. No. 94-CA-12, 1994 WL 590493. However, such evidence may be considered on the issue of whether the property is marital or separate. Id.
 {¶ 79} In the case sub judice, testimony was adduced at trial that the Kelly Street property was already paid for in full at the time of the parties' marriage in 1992. In fact, the property had been paid for since 1969. Appellee testified at the trial before the Magistrate that he placed appellee's name on the deed to the Kelly Street property in 1994 for estate planning purposes. He further testified that he wanted appellant to receive the Kelly Street property upon his death under the belief that the two would remain married until death. As noted by the Magistrate, appellee "did not state it was to avoid probate costs and delay or for any other pecuniary reason."
 {¶ 80} Furthermore, while appellee's name was added to the deed for the Parrish Street property, which was appellant's premarital property, via a joint and survivorship deed in 1994,[3] testimony was adduced at the trial that appellant kept all of the rental income and sale proceeds from the same for herself.
 {¶ 81} Based on the foregoing, we find that the trial court did not err in awarding appellee the Kelly Street property as his separate property. We concur with the trial court that appellant did not, by clear and convincing evidence, show a donative intent on the part of appellee when appellant's name was added to the deed for the Kelly Street property. *Page 15 
 {¶ 82} Appellant's first assignment of error is, therefore, overruled.
 II {¶ 83} Appellant, in his second assignment of error, contends that the trial court erred in adopting the Magistrate's Decision "without modification" and then reducing appellant's property award. We disagree.
 {¶ 84} The Magistrate, in her decision, recommended that appellee pay appellant $7,626.39 as a property settlement. The Magistrate arrived at such figure by adding appellant's ½ share of the Dover-Phila account, or $2,003.13[4], to appellant's ½ share of the cost of improvements to appellee's home, or $7,000.00. These two figures add up to $9,013.13. The Magistrate then deducted $1,376.74, which was the balance of the $10,000.00 loan that appellee made to appellant to pay off the Parrish Street house,[5] arriving at a total property division award of $7,626.39.
 {¶ 85} The trial court, in its January 12, 2006 Judgment Entry, indicated that it was adopting the Magistrate's Decision "without modification." The trial court then held that appellee was obligated to pay appellant "as and for the total property settlement in this case, the sum of $5,623.26. The trial court arrived at the $5,623.26 figure by deducting the $2,003.13 that appellant had already received from appellee as her share of the credit union account from the Magistrate's recommended property division award of $7,626.39. Further, the trial court, in its entry, stated, in relevant part, as follows:
 {¶ 86} "ORDERED, ADJUDGED AND DECREED that in applying the $3,100.00 credit for overpaid monetary spousal support to Marjorie Gibson, the total property settlement amount owed by John T. Gibson, Sr. to Marjorie Gibson is $2,523.26 less *Page 16 
the $100.00 owed by Marjorie Gibson to John T. Gibson, Sr. as a mediation sanction (see above) within thirty (30) days of the journalization of this Judgment Entry."
 {¶ 87} Based on the foregoing, we find that the trial court did not modify the Magistrate's Decision and did not reduce the property award, by rather applied the Magistrate's Decision. The trial court merely gave a credit to the appellee for amounts already paid to the appellant.
 {¶ 88} Appellant's second assignment of error is, therefore, overruled.
 III {¶ 89} Appellant, in her third assignment of error, maintains that the trial court erred in granting appellee a $3,100.00 credit on spousal support paid by him and in failing to order permanent spousal support. We disagree
 {¶ 90} As is stated above, appellee was ordered to pay temporary spousal support to appellant in the amount of $700.00 per month, effective December 1, 2003. The trial court, in its January 12, 2006, Judgment Entry, awarded appellant spousal support in the amount of $400.00 a month for a period of 36 months, for a total of $14,400.00. Since appellee had already paid $17,500.00 in temporary spousal support, the trial court awarded appellee a credit of $3,100.00. ($17,500.00 — $14,400.00).
 {¶ 91} A review of a trial court's decision relative to spousal support is governed by an abuse of discretion standard. Cherry v.Cherry (1981), 66 Ohio St.2d 348, 421 N.E.2d 1293. We cannot substitute our judgment for that of the trial court unless, when considering the totality of the circumstances, the trial court abused its discretion.Holcomb v. Holcomb (1989), 44 Ohio St.3d 128, 541 N.E.2d 597. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, *Page 17 
arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 450 N.E2d 1140.
 {¶ 92} R.C. 3105.18(C)(1)(a) through (n) sets forth the factors a trial court must consider in determining whether spousal support is appropriate and reasonable and in determining the nature, amount, terms of payment, and duration of spousal support. These factors are:
 {¶ 93} "(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
 {¶ 94} "(b) The relative earning abilities of the parties;
 {¶ 95} "(c) The ages and the physical, mental, and emotional conditions of the parties;
 {¶ 96} "(d) The retirement benefits of the parties;
 {¶ 97} "(e) The duration of the marriage;
 {¶ 98} "(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;
 {¶ 99} "(g) The standard of living of the parties established during the marriage;
 {¶ 100} "(h) The relative extent of education of the parties;
 {¶ 101} "(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties; *Page 18 
 {¶ 102} "(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;
 {¶ 103} "(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;
 {¶ 104} "(l) The tax consequences, for each party, of an award of spousal support;
 {¶ 105} "(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;
 {¶ 106} "(n) Any other factor that the court expressly finds to be relevant and equitable."
 {¶ 107} Appellant initially argues that the trial court erred in reducing the amount of spousal support from the $700.00 a month initially ordered as temporary spousal support to $400.00 a month and in crediting appellee with a claimed overpayment of $3,100.00. However, as noted by the court in Drumm v. Drumm, (March 26, 1999), Montgomery App. Nos. 16631, 17115, 1999 WL 198120, "a court has the inherent power to vacate, reverse or modify one of its own orders in a matter pendante lite, that is, until it loses jurisdiction of the cause by entering a final order. That includes the power to modify its own prior temporary support orders." Id at 7. Thus, the trial court acted within its authority in modifying the prior support order from $700.00 a month to $400.00 a month for a period of 36 months, or $14,400.00. Since appellee had paid a *Page 19 
total of $17,500.00, the trial court correctly credited appellee with $3,100.00. While appellant argues that the trial court "improperly considered and mixed issues of property [division] and `spousal support'", we disagree. The trial court merely applied appellee's spousal support credit against the amount appellee owed appellant as and for the property division. Unlike in Miller v. Miller, Coshocton App. No. 06 CA 3, 2006-Ohio-7019, cited by appellant, the trial court did not condition spousal support upon any debt responsibility or upon the property division.
 {¶ 108} Appellant further argues that the trial court abused its discretion in failing to order permanent spousal support to appellee. We disagree. Testimony was adduced at trial that appellant, who was 66 years did as of trial, receives $421.00 a month in social security and has no pension. She testified that her monthly expenses were $1,096.47. While appellant testified that she pays $350.00 a month in rent to her daughter, appellant's daughter testified that she would not evict appellant if appellant was unable to pay the same. Appellant's daughter also pays the taxes, gas and water for the Parrish Street home while appellant pays her separate electric, telephone and cable bills.
 {¶ 109} Appellant, also contends that she transferred her only income producing property, the Parrish Street house, to appellee and that he benefited from the same. However, testimony adduced at trial established that appellant received the rental income from the property from 1992 until she sold the house to her daughter in 1999 and, after she sold the same to her daughter, kept the proceeds after reimbursing appellant part of the money that he had loaned her to pay off the house. Thus, *Page 20 
appellant received the full benefit of the Parrish Street property while appellee received none of the benefit of the same.
 {¶ 110} Furthermore, testimony was adduced at trial that appellant had only worked for eight months after the parties' marriage before retiring and that he received two checks a month from his former employer, one check is in the amount of $326.39, the other is in the amount of $213.49, a social security check in the amount of $938.00 a month and a monthly check in the amount of $800.00 from a Pioneer Fund account, which is a premarital account. Thus, nearly all of appellee's income comes from assets which were accumulated prior to the marriage. As is stated above, appellee has paid the spousal support obligation of $14,400.00 (which represents $400.00 x 36 months). Testimony also was adduced that appellant who is 71 years old, has significant health problems, including leukemia and diabetes and has expenses totaling $1,400.00 a month. Moreover, both parties were debt-free at the time appellant left appellee.
 {¶ 111} While we acknowledge the disparity regarding each party's ability to pay his/her own living expenses, we find that the trial court did not abuse its discretion in failing to order permanent spousal support. The trial court's decision was not arbitrary, unreasonable or unconscionable.
 {¶ 112} Appellant's third assignment of error is, therefore, overruled.
 IV {¶ 113} Appellant, in her fourth assignment of error, argues that the trial court erred in granting appellee all of his claimed separate property and in not granting appellant her separate property or the equivalent value. We disagree. *Page 21 
 {¶ 114} The "separate property" that appellant refers to is the Parrish Street property owned by appellant prior to the parties' marriage. As is stated above, testimony was adduced at trial that appellant owned a home on Parrish Street before the parties' marriage. There was testimony from appellant's daughter as well as from other Parrish Street tenants that they paid the rent to appellant. While the total rental income received from the Parrish Street house was $618.00 a month, the mortgage payment on the same, which appellant paid, was $228.00 a month. Appellee testified that he did not receive any of the rental income since it was appellant's money. While appellant testified otherwise, the Magistrate, as trier of fact, clearly found appellee to be credible and noted so in her decision.
 {¶ 115} Moreover, testimony also was adduced that appellant sold the Parrish Street house to her daughter and son-in-law in November of 1999 and then donated $10,000.00 of the $18,623.25 in proceeds to her church. Appellant then repaid appellee, who had loaned her $10,000.00 to pay off the house, the remainder ($8,623.26). In short, based on the foregoing, there was testimony that appellant received both all of the rental income and all of the proceeds from the sale of her premarital home and thus received the full benefit of her premarital property.
 {¶ 116} Appellant's fourth assignment of error is, therefore, overruled.
 V {¶ 117} Appellant, in her fifth and final assignment of error, argues that the trial court erred in failing to find that appellee had committed financial misconduct and in failing to award appellant a distributive award on such basis. We disagree. *Page 22 
 {¶ 118} R.C. 3105.171(E)(3) states that "[i]f a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property." A determination on financial misconduct lies in the trial court's sound discretion. Huener v.Huener (1996), 110 Ohio App.3d 322, 674 N.E.2d 389. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,450 N.E.2d 1140.
 {¶ 119} Appellant specifically contends that appellee violated a December 2, 2003, restraining order by withdrawing $9,985.32 in funds from a joint Belmont National Bank account and placing the same into a separate account, which as of November 2004, had a balance of $7,597.44 . Appellant argues that appellee "used $2,387.88 from that account without permission of the court ($9,985.32 minus $7,797.44 = $2,387.88)." Appellant also contends appellee violated such restraining order by removing a 1989 Oldsmobile that was in appellant's name, and by refusing to tell the court where he kept money in his house. Moreover, appellant argues that appellee committed financial misconduct by closing a joint account at Dover-Phila Credit Union after appellant left and placing money from the same into his separate account.
 {¶ 120} However, the testimony was undisputed at trial that appellee established the Pioneer Fund account with premarital funds and that appellant never made any deposits or withdrawals from the same. With respect to the Belmont National Bank account testimony was adduced at trial that appellee established such account prior to *Page 23 
his marriage to appellant and that he deposited his $800.00 a month checks from Pioneer, which were premarital funds, directly into the same. Appellant's name was later added to such account. While there was testimony that appellee transferred $9,985.32 from such joint account at Belmont National Bank into a separate account, appellee testified at trial that he withdrew money from the same to pay spousal support and to pay his attorney fees. Any remaining money in the account after appellee paid spousal support and attorney fees was appellee's premarital money.
 {¶ 121} While appellant further maintains that appellee committed financial misconduct by withdrawing funds from his Pioneer Fund account, to which appellee had added appellant's name, the testimony was undisputed that the Pioneer Fund account was appellee's premarital property and that appellant never contributed to the same. The trial court, for such reason, awarded the same to appellee.
 {¶ 122} The only joint account was the Dover-Phila Credit Union account. Testimony was adduced at trial that appellant did not contribute to such account, which appellee established using premarital funds, until after June of 2002, when her social security check was deposited into such account. Appellee requested, and the trial court agreed that the approximately, $4,000.00 in such account be divided equally between the parties.
 {¶ 123} Moreover, while appellant contends that appellee committed financial misconduct by "refusing to disclose where he had hidden money", it is clear from the portion of the transcript appellant cites to that appellee was merely hesitant to tell the world where he keeps money in his house. Appellee, when asked whether he kept his money "in the house, in the bank?" responded that he did not "tell everybody where I *Page 24 
keep my money." Transcript at 169. This does not rise to the level of financial misconduct. Finally, testimony was adduced at the hearing that the Oldsmobile was not running and the same was awarded to appellant.
 {¶ 124} Based on the foregoing, we find that the trial court did not err in failing to find that appellee had committed financial misconduct and in failing to award appellant a distributive award on such basis.
 {¶ 125} Appellant's fifth assignment of error is, therefore, overruled.
 {¶ 126} Accordingly, the judgment of the Tuscarawas County Court of Common Pleas is affirmed.
Edwards, J. Hoffman, P.J. and Farmer, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Tuscarawas County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] All references to the Transcript, unless otherwise indicated, shall be to the single volume containing the transcripts of the hearings before the Magistrate held on October 26, 2004, November 16, 2004 and January 14, 2005.
[2] Appellant had been sanctioned $100.00 for failing to appear at a scheduled mediation.
[3] As is stated above, in 1994, the parties made all of their property joint.
[4] The balance in such account was $4,006.26.
[5] At trial, appellant testified that she repaid $8,623.26 of the $10,000.00 loan. *Page 1